STEVEN G. KALAR
Federal Public Defender
SHILPI AGARWAL
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    415.436.7700
Facsimile:    415.436.7706
Email:        Shilpi_Agarwal@fd.org

Counsel for Defendant Felipe Velez

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>     v.<br><br>FELIPE VELEZ,<br><br>                    Defendant. | No. CR 15-00102 WHA<br><br>**DEFENDANT FELIPE VELEZ'S NOTICE OF MOTION AND MOTION TO SUPPRESS**<br><br>Hearing Date:  May 19, 2015<br>Hearing Time:  2:00 pm<br>Court:         Hon. William Alsup |

PLEASE TAKE NOTICE that on May 19, 2015 at 2:00 p.m. in the courtroom of the Honorable William Alsup, Defendant FELIPE VELEZ will move this Court for an order suppressing all evidence and statements obtained via unlawful seizures conducted by officials from the San Francisco Police Department on January 2, 2015 in San Francisco, California. This motion is based on the Constitution of the United States, all relevant case law and statutory authority, the following memorandum of points and authorities, any reply memorandum, and any oral argument made at the motion hearing.

Should any disputed issue(s) of material fact arise with respect to this motion to suppress, Mr. Velez further moves this Court for an evidentiary hearing.

**FACTUAL BACKGROUND**

The following factual statements are derived from the incident reports prepared by San Francisco Police Department ("SFPD") as well as the testimony of Officer Michael Graham at the preliminary hearing held before the San Francisco Superior Court on January 20, 2015.[1]

On January 2, 2015 at approximately 6:33 pm, Officers Perdomo, Sands, and Graham were on duty in plainclothes, riding in an unmarked SFPD radio car.  Declaration of Shilpi Agarwal in Support of Defendant's Motion to Suppress (Agarwal Decl.), Ex. A at FV-000167. Sergeant Perdomo was driving, Officer Graham was in front passenger seat, and Officer Sands was in the back seat.  *Id.*   The officers heard a communication over the radio reporting a theft from a local Radio Shack.  *Id*. at FV-000204.  The person suspected in the reported theft was described as a light-skinned black male adult, approximately 20 years old, 5 feet 8 inches tall, thin build, wearing a black hooded sweatshirt and blue jeans.  *Id*. at FV-000204-205.  The officers also learned from dispatch that the suspect had taken a pair of red Beats headphones.  *Id*. at FV-000205.

The officers responded to the location of the Radio Shack, 2710 Mission Street, between 23rd and 24th Street in San Francisco's Mission District.  *Id*. at FV-000204. They stopped at a red light on Capp Street, facing south, at the intersection with 24th Street, approximately two blocks away from the Radio Shack.  *Id.*  Attached hereto as Exhibit B is a map marking the location of the Radio Shack, and also pinpointing the approximate location of the police vehicle at the time of these events.  Agarwal Decl., Ex. B.

While stopped at the red light, the officers noticed a male standing at the southwest corner of Capp St. and 24th Street.  Agarwal Decl., Ex. A at FV-000207.  At the time, the officers did not know the identity of the male, but they later identified him as the defendant, Mr. Felipe Velez.  Officer Graham claimed that Mr. Velez was standing in an area that was not well lit, and that they could tell that he was approximately 5'9" and wearing a black sweatshirt, but

---

[1]  Mr. Velez's recitation of the contents of the police reports and testimony of the Officer Graham does not constitute an admission of the veracity of the matters contained in those materials.

nothing more.  *Id*. at FV-000167.  Officer Graham later admitted, however, that the southwest corner of 24th Street and Capp Street is illuminated by an overhead street light.  *Id*. at FV-000231-232.  Mr. Velez was wearing black pants, not blue jeans.  *Id*. at FV-00028-00029.  He was also wearing a baseball cap on his head and had visible facial hair, none of which were mentioned in the radio communication.  *Id*. at FV-000227-228.  They drove the car through the intersection to where Mr. Velez was standing, purportedly to get a better look at him.  *Id*. at FV-000208.

As they approached him in the vehicle, Mr. Velez began to walk south on Capp Street, away from 24th Street and from the vehicle.  *Id*. at FV-000208.  Officer Graham testified that, although the vehicle was unmarked, it is common for people to recognize the vehicle as an unmarked police vehicle.  *Id*. at FV-000209.  The officers drove the car forward and stopped just south of 24th Street.  Officer Graham reported that Sergeant Perdomo shined a flashlight directly on Mr. Velez and said the word "police."  *Id*. at FV-0002010.  Mr. Velez continued to walk southbound on Capp Street.  *Id.*

Officer Graham, in plainclothes, exited the vehicle through the front passenger side door and walked toward Mr. Velez.  *Id.* at FV-000210.  He saw Mr. Velez stop behind a large utility box.  *Id*. at FV-000201; FV-000174.  Officer Graham announced that he was "San Francisco Police" and continued walking toward Mr. Velez.  *Id*. at FV-000211.  Graham's SFPD-issued star was hanging from his neck and displayed on his chest.  *Id*.   At some point, Officer Sands also exited the vehicle.  *Id*. at FV-000169.  Mr. Velez then began walking back towards 24th Street, in the opposite direction from the one he had been walking, and away from Officer Graham.  *Id*.   Offer Graham, still outside of the car, again announced that he was San Francisco Police and issued a "stop" order.  *Id*.   Velez continued to walk away but, looking directly at Officer Graham, he said "Naw man, I'm just talking to my mom."  *Id*. at FV-000211-212.  Officer Graham could see that Mr. Velez was holding a cell phone in his hand as he said this.  *Id*. at FV-000211.  Officer Graham again ordered Mr. Velez to stop.  *Id*. at FV-000167.  Mr. Velez then began running towards the intersection of 24th and Capp Street.  *Id*.  Officer Graham ran after him and again ordered him to stop.  *Id.* at FV-000213.

Mr. Velez ran into the intersection of 24th Street and Capp Street. *Id*. at FV-000213. Officer Graham testified that there was no crosswalk at that location, but photographs of the area confirm that there is a crosswalk at that intersection. *Id*; Agarwal Decl., Ex. C. Officer Sands reports that he saw Mr. Velez trip and fall in the middle of the intersection, but then get up and continue to run. Agarwal Decl., Ex. A at FV-000169. Officer Graham caught up with Velez in the middle of the intersection, and grabbed his shoulder. *Id*. at FV-000214. Mr. Velez struggled to break free of Officer Graham's grasp. *Id*. Officer Sands then caught up and assisted Officer Graham in bringing Mr. Velez to the ground. *Id*. When the officers looked down, they saw a gun and multiple rounds of ammunition on the ground, near Mr. Velez's feet. *Id*. The officers handcuffed Mr. Velez, and seized the firearm and the ammunition. *Id*. at FV-000215-216.

On January 13, 2015, Officers Sands, Graham, Barbosa, Camilosa and Trujillo, and Sergeant Cortez, performed a search of Mr. Velez's grandmother's house. *Id.* at FV-000256. Specifically, they searched the room where Mr. Velez's grandmother indicated that Mr. Velez slept. *Id.* The officers seized various objections from the room and booked them into evidence. *Id*.

## ARGUMENT

### I.   MR. VELEZ WAS SEIZED WHEN HE STOPPED MOVING IN RESPONSE TO THE POLICE OFFICERS' SHOW OF AUTHORITY.

A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). An individual is seized within the meaning of the Fourth Amendment "when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal quotation omitted). A person's liberty is restrained when, taking into consideration "all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Courts have articulated this same standard as whether "a reasonable person would have believed that he was not free to

leave." *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (citing and quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Thus, the question presented here is whether Mr. Velez was seized—that is, whether Mr. Velez's liberty was constrained due to the officers' demonstration of authority.  Mr. Velez submits that a seizure occurred when, in response to the police officer's action, he stopped his movement behind the utility box on 24th Street, prior to changing directions in response to the officers' commands.  Even if Mr. Velez was not seized when he stopped his movement behind the utility box, there is no question that he was seized when Officer Graham grabbed him by the shoulder.  *See Terry*, 392 U.S. at 1 (a seizure occurs when a person's freedom of movement has been restrained by initiation of physical contact).

## II.     THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATING THAT THE WARRANTLESS SEIZURE OF MR. VELEZ WAS JUSTIFIED.

It is well-established that any seizure made without a warrant is *per se* unreasonable— subject only to a few specifically established and well-delineated exceptions.  *E.g., United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012); *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).  "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government."  *Scott*, 705 F.3d at 416 (citing *Hawkins*, 249 F.3d at 872); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988) ("The government bears the burden to show that a warrantless seizure does not violate the Fourth Amendment.").  The government must prove the lawfulness of a warrantless seizure or search by a preponderance of the evidence.  *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The government must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of the evidence.").

Mr. Velez invites the government to demonstrate that his presumptively unreasonable seizure by the SFPD officers in this case was lawful, but he respectfully submits that the

1   government will fail to meet its burden.  Accordingly, all evidence obtained as a result of this

2   Fourth Amendment violation must be suppressed as "fruit of the poisonous tree."

3        "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence

4   obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is

5   inadmissible . . . unless the evidence obtained was 'purged of the primary taint.'"  *Washington*,

6   490 F.3d at 775 (quoting *Wong Sun v. United States.*, 371 U.S. 471, 488 (1963)); *see also United*

7   *States v. Davis*, 332 F.3d 1163, 1170-71 (9th Cir. 2003) (stating that "the standard articulated in

8   *Wong Sun* remains the relevant test").  "The question is whether, granting establishment of the

9   primary illegality, the evidence to which instant objection is made has been come at by

10  exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the

11  primary taint."  *United States v. Johns*, 891 F.2d 243 (9th Cir. 1989).  In addition, "the

12  government has the burden to show that the evidence is not 'the fruit of the poisonous tree.'"

13  *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000).

14

15       Appropriate suppression in this case extends to any statements made by Mr. Velez,[2] as

16  well as any other evidence or information obtained from him subsequent to his seizure.

17  Specifically, under the "fruit of the poisonous tree" doctrine, the Court should suppress the

18  firearm and ammunition recovered on January 2, 2015, as a result of the presumptively

19  unreasonable, warrantless seizure of Mr. Velez.  Moreover, the officers' subsequent search of the

20  room in Mr. Velez's grandmother's house, after Mr. Velez was taken into custody on January 2,

21  2015, was performed as a direct result of the evidence that was gathered pursuant to the unlawful

22  seizure; indeed, the unlawful seizure is specifically mentioned in the incident report describing

23  the search.  Agarwal Decl., Ex. A at FV-000256.  Thus, any evidence that the police gathered in

24

25

26

27

28  [2] *See, e.g., Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

the search of that room is also tainted by the illegal seizure.  The Court should therefore also suppress the evidence that the officers recovered from the house on January 13, 2015.

**III.    THE GOVERNMENT CANNOT MEET ITS BURDEN OF SHOWING THAT THE OFFICERS' SEIZURE OF MR. VELEZ WAS JUSTIFIED BY REASONABLE SUSPICION.**

The government will likely argue that the warrantless seizure of Mr. Velez was justified because, at the point at which he was seized, the officers had reasonable suspicion that Mr. Velez had committed a crime.  "[A] brief investigatory detention, while constituting a seizure, is not a violation of the Fourth Amendment provided that the police officer has reasonable suspicion 'that criminal activity may be afoot.'" *United States v. Orman*, 486 F.3d 1170, 1173 (9th Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. at 1). "In determining whether a stop was justified by a reasonable suspicion, we consider whether, in light of the totality of the circumstances, the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).  A subject's presence in a high-crime area is not enough.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).  While "nervous, evasive behavior" such as headlong flight may be a pertinent factor, *Wardlow*, 528 U.S. at 124, the Ninth Circuit requires more than simply walking away from police in a high-crime area to warrant an investigatory detention.  *Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005); *see also United States v. Valentine*, 232 F.3d 350, 357 (3rd Cir. 2000) ("Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area[.]").

Here, the police officers did not have reasonable suspicion that Mr. Velez was the individual who stole red Beats headphones from Radio Shack.  At the time Mr. Velez was seized, or when he stopped his movement, the officers had seen him standing under a street light, driven up to him on a relatively narrow street, had seen him turn directly towards their car, and shone a flashlight directly at him.  By the time Officer Graham grabbed his shoulder, Officer Graham had followed Mr. Velez on foot for several minutes, and Mr. Velez had turned directly

towards him and spoken to him.  The officers knew, at that point, that Mr. Velez did not match the description of the Radio Shack suspect that was described over the radio.  Mr. Velez is not a light-skinned black man; he is of Hispanic descent.  Mr. Velez was not wearing blue jeans, he was wearing black pants.  These significant physical distinctions were readily apparent to the officers by the time Mr. Velez was seized.  Moreover, at the time of the seizure, Mr. Velez was wearing a baseball cap and had facial hair, both distinctive markings that where not mentioned in the radio communication describing the suspected thief.  Indeed, nowhere on Mr. Velez's person did the officers see Beats headphones, which are fairly large and would have been visible had Mr. Velez been carrying them.  *See* Agarwal Decl., Ex. D.  It is also unreasonable to assume that the person who robbed the Radio Shack would remain standing on a neighborhood corner two blocks from the site of the robbery, just waiting to be discovered.

## CONCLUSION

For the foregoing reasons, Defendant Felipe Velez respectfully requests that the Court grant his motion to suppress or, if it proves necessary, order an evidentiary hearing to resolve any material factual disputes.

Date:  April 21, 2015

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender


_____/s/_____

SHILPI AGARWAL
Assistant Federal Public Defender