United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

FELIPE VELEZ,

    Defendant.

No. CR 15-00102 WHA

**ORDER DENYING FIRST MOTION TO SUPPRESS EVIDENCE**

## INTRODUCTION

In this Section 922(g) prosecution, defendant moves to suppress evidence obtained by police. For the reasons stated below, defendant's motion is **DENIED**.

## STATEMENT

This order takes most of the relevant facts from the transcript of a related state court proceeding that took place on January 20, 2015. In state court, defendant Felipe Velez moved to suppress the same evidence he moves to suppress here. During that hearing, Officer Michael Graham testified about the relevant facts that are at issue in the instant motion. Judge Carol Yaggy of the San Francisco Superior Court denied defendant's motion to suppress in the state court prosecution.

On January 2, 2015, around 6:20 p.m., there was a reported theft of a pair of Beats headphones from the Radio Shack at 2710 Mission Street in San Francisco. Police dispatch described the suspect as a 20-year-old, light-skinned black male, standing five feet eight inches tall, having a thin build, and wearing a black hooded sweatshirt with blue jeans. Three plain-

clothed police officers spotted a person matching a substantial part of that description roughly fifteen minutes after the reported theft and two blocks from the Radio Shack, who was later identified as defendant Felipe Velez. Velez is a light-skinned Hispanic male who was almost 24 years old at the time, standing five feet eight inches tall, weighing 155 pounds, and was wearing a black hooded sweatshirt. While Velez did not match the suspect's description exactly (he was wearing black rather than blue jeans), his appearance was close. Velez had a mustache but the Radio Shack report was silent on that feature (Agarwal Decl., Exh. A at 165, 203–08, 212, 227–29).

The officers spotted Velez standing on the street corner two blocks away from the Radio Shack, about fifteen minutes after the reported theft occurred. When Officer Graham first spotted Velez, he could only tell that Velez was about the same height and build of the suspect, and also had a black hooded sweatshirt on (*id.* at 204–208, 231–32).

The officers then pulled up close to where Velez was standing so that Velez was parallel to their vehicle. Sergeant Sean Perdomo shined his flashlight on Velez and said "police." Although the officers were about twenty feet away from Velez at this point, Officer Graham testified that he was unable to get a better look at Velez and could not tell if he matched the suspect's description (*id.* at 208–210, 235).

After looking in the direction of the vehicle, Velez continued to walk south, ignoring the officers. Officer Graham then got out of the vehicle and began walking towards Velez. He observed Velez disappear behind "a large [utility] box that's on the sidewalk on Capp Street." Officer Graham thought that Velez was attempting to hide. After Officer Graham observed this, he announced himself as "San Francisco Police" and continued walking towards the utility box. When he was about fifteen feet away from Velez, Officer Graham saw Velez "come out from behind the box and begin to walk back towards [24th] Street." Officer Graham announced himself again as "San Francisco Police officer" and ordered Velez to stop. Velez continued walking towards 24th Street and responded to Officer Graham's order to stop by saying, with his cell phone in hand, "nah, man, I'm just talking to my mom." Within seconds of telling Officer Graham that he was talking to his mom, however, Velez turned away from Officer Graham and

2

began sprinting toward the intersection of 24th and Capp Street. Officer Graham then ran after him (*id.* at 210–213).

As Officer Graham chased after Velez, he announced himself again as a police officer and ordered Velez to stop. Velez ignored this order and ran into the intersection when the light was red, without using the crosswalk, committing a vehicle code violation. Officer Graham recalled that multiple vehicles were in the intersection at the time, and that one car had to "stop short" of Velez (*id.* at 213–214).

Officer Graham ran into the intersection, managed to catch up to Velez, and grabbed him by the shoulder from behind. Velez struggled with Officer Graham and attempted to get away. Officer David Sands, who was running a few seconds behind Officer Graham, helped Officer Graham take Velez to the ground. As the officers took Velez down, Officer Graham heard the sound of metal striking the asphalt and saw a revolver and ammunition on the ground. Velez was eventually handcuffed and arrested. The revolver and ammunition were taken into evidence (*id.* at 214–17).

A week and a half later, the police conducted a search of 505 Potrero Avenue, the residence of Velez's grandmother, Endina Flores. The officers advised Flores that they were going to conduct a parole search of Velez's room. Flores directed the officers to a room in her home and told the officers that Velez slept in the room when he was home, but she slept in the room when he was not home. The officers found a gun holster, ammunition, and "gang indicia" in this room (*id.* at 256).

Velez was on parole from a prior state conviction at the time of his arrest. As part of his parole conditions, his residence was subject to search or seizure by any peace officer at any time with or without a search warrant or cause. The same parole conditions also state that Velez "shall stay away from 505 Potrero Ave unless [his] Parole Agent gives [him] permission" (Maffei Suppl. Decl., Exh. A).

Defendant moves to suppress all of the above evidence. This orders follows full briefing and oral argument.

3

## ANALYSIS

"A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission . . . ." *Brendlin v. California*, 551 U.S. 249, 254 (2007).

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a police man yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.

*California v. Hodari D.*, 499 U.S. 621, 626–27 (1991).

Although Velez continued to struggle with Officer Graham after Graham grabbed his shoulder, the initial grabbing of his shoulder constituted a seizure. Defendant concedes that no "seizure" occurred until this moment (Reply at 2).

A police officer may "seize" a person if the officer had a "reasonable suspicion" supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective reasonable inferences, form a basis for particularized suspicion." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).

The Supreme Court has held that: "Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." The Supreme Court described the following scenario:

> When an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any refusal to cooperate does not furnish the minimal level of objective justification needed for a detention or seizure. But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (citations omitted).

Here, taking Velez's actions and the totality of the circumstances into account, the police officers had the requisite reasonable suspicion, such that they could lawfully seize Velez.

4

*First,* Officer Graham observed that Velez matched several of the Radio Shack theft suspect's characteristics (approximate height, thin build, age, dark jeans, and a black hooded sweatshirt). Moreover, the officers encountered Velez two blocks away from the Radio Shack only fifteen minutes after the alleged theft occurred. It is true that Velez did not match some other characteristics of the Radio Shack suspect. Velez was a light-skinned Hispanic rather than a light-skinned African-American, wore black jeans rather than blue jeans, and also had a mustache (the description over the police dispatch did not mention anything about facial hair either way). These discrepancies, however, were minor, and were outweighed by the similarities the officers observed between Velez and the Radio Shack suspect. The similarities in appearance and matching characteristics between Velez and the Radio Shack suspect go a long way towards providing the officers with the reasonable suspicion necessary to seize him.

*Second*, Velez's sprint away from police officers, when they were attempting to talk to him, was suggestive of criminal conduct. As stated above, the Supreme Court has held: "Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. And the flight in question was unprovoked within the meaning of the paragraph from *Wardlow*, quoted above. In addition, Velez's evasive behavior, before he took off running, further suggested criminal activity was afoot. Velez exhibited evasive behavior when he ducked behind the utility box, came out with a phone in his hand, and told the officer, "nah man, I'm just talking to my mom," before launching into a headlong flight. The police construed Velez's furtive movements as evasive behavior and it was reasonable to do so (Agarwal Decl., Exh. A at 210–213).

*Third*, before the officers seized Velez, they saw him commit a traffic violation. Officer Graham observed Velez run through an intersection against a red signal, without using a crosswalk. That was a violation of Section 21453(d) of California's Vehicle Code. Officer Graham recounted at least one car having "to stop short" of Velez. This happened before Officer Graham grabbed defendant by the shoulder.

5

1    The Supreme Court has held that in determining whether the police had reasonable
2 suspicion "we must consider the totality of the circumstances — the whole picture. . . . Any one
3 of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent
4 travel.  But we think taken together they amount to reasonable suspicion." *Sokolow*, 490 U.S. at
5 8–9.  Taken together, the fact that Velez's physical appearance substantially matched that of the
6 Radio Shack suspect, his evasive behavior and headlong flight, and Velez's disregard for traffic
7 rules and safety, gave the officers reasonable suspicion that criminal activity was afoot.  While
8 any one of these events, on its own, could have provided the officers with reasonable suspicion,
9 the events, in combination, provided the officers with the reasonable suspicion needed to seize
10 Velez.
11   Velez argues that the officers did not have the requisite reasonable suspicion to seize him
12 for the following reasons.
13   *First*, defendant argues that the officers lacked reasonable suspicion to conclude that
14 Velez committed the Radio Shack theft.  While Velez did share many characteristics with the
15 suspect described over police radio, as described above, there were also some discrepancies.
16 Velez emphasizes that he was wearing black jeans at the time of the arrest rather than blue jeans,
17 had a mustache, and wore a black knit cap on his head under the hood rather than just the hood
18 itself with nothing underneath.  In addition, Velez argues that it would be unreasonable to
19 believe that a suspect would be so foolish as to remain on the street in close proximity to the
20 crime (Reply at 5).  As discussed above, however, Velez substantially matched the physical
21 characteristics of the Radio Shack suspect.  There will always be discrepancies.  This was not the
22 only factor that provided the officers with the requisite reasonable suspicion.  It was merely one
23 factor that added to the totality of the circumstances.
24   *Second*, Velez argues that he was not evading police and that his headlong flight did not
25 give the officers reasonable suspicion.  Instead, Velez argues that he was exercising his "right to
26 ignore the police and go about his business." *Wardlow*, 528 U.S. at 125.  Moreover, Velez
27 argues that his flight was provoked, as the officers were harassing him and he was forced to run
28 away to evade their harassment.  The officers, however, construed Velez's furtive movement as

6

an attempt to hide. Velez may not have been trying to hide, but the officers' interpretation was reasonable. There is a wide gulf between ignoring the police and going about one's business versus hiding behind a utility box and then sprinting away and crossing the street against a red light.

*Third*, Velez argues that the area in which the incident took place was not a high-crime area, and thus the headlong flight on its own did not provide the officers with reasonable suspicion. It is unclear whether the area in which the incident took place (the intersection of 24th and Capp streets in San Francisco) is currently a high-crime area. The SFPD had formally designated it as a high-crime zone in 2007 and has not rescinded this determination. Officer Graham also testified that the incident took place in a high-crime area. Whether or not the area in question constituted a high-crime area, however, is of no moment. Apart from the crime level, the officers had sufficient reasonable suspicion for the reasons described above.

*Lastly*, while the government argues that Velez was not seized until he had been subdued by police (after the gun had fallen out of his jacket), Velez argues he was seized when Officer Graham first caught up to him and grabbed his shoulder. This difference is immaterial. As stated above, the evasive behavior, headlong flight, violation of the traffic code (which Velez does not dispute), and Velez's resemblance to the Radio Shack suspect, in combination, provided the officers with the reasonable suspicion necessary to seize Velez before they grabbed his shoulder. Officer Graham could have reasonably believed, based on this behavior, that Velez was guilty of a crime or about to commit criminal activity.

Because the seizure of Velez was reasonable, the evidence obtained as a result of the police officers' subsequent search of Velez's grandmother's residence does not amount to fruit of the poisonous tree.

At oral argument, the undersigned judge asked both sides for their position on whether a second evidentiary hearing was needed to rule on the instant motion. The government responded that there was no need for a further evidentiary hearing. Defense counsel tried to have it both ways, and only stated that if the undersigned judge was leaning toward granting the motion, then they did not want an evidentiary hearing, but if not, then they did want an evidentiary hearing.

As stated above, in a related state court prosecution, the same defendant moved to suppress the same firearm, for the same reasons, and an evidentiary hearing was held in that case. There, Velez had a full opportunity to cross examine the police officers and to make an evidentiary record. Based on the evidentiary record before the Court, and the fact that an analogous hearing with live testimony and an opportunity for cross examination already occurred in state court, this order finds that an evidentiary hearing is not required here.

## CONCLUSION

For the reasons stated above, defendant's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 1, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE